## GOLDEN *v.* STATE.

No. 39624 March 28, 1955 78 So. 2d 788

*Robertson Horton,* Winona; *King & King,* Durant, for appellant.

*Wm. E. Cresswell,* Asst. Atty. Gen., Jackson, for appellee.

Roberds, P. J.

Golden was convicted of assault and battery upon Jessie May Golden, his wife, with intent to kill her, and sentenced to the state penitentiary for ten years. On this appeal he says, first, the conviction was against the great weight of the evidence, and, second, that the trial judge granted to the State an erroneous instruction. He urges reversal and remand of the case for another trial.

The first contention calls for a summary of the testimony.

The first witness for the State was Jessie May Golden. She was 27 years of age. She and the defendant married April 17, 1947. They have three children — ranging from one to five years of age. The offense was committed the night of February 21, 1953. It occurred at their home. The instrument used by defendant is designated in the record a " * * * red hot wagon rod or iron poker" some three feet long. Defendant conceived the idea his wife had some money which she refused to deliver to him. It is not shown she had any money. She says she had none. Here is her partial account of what happened: "It was on a Saturday night and was kind of drizzling rain and he came back from

town early and was laying in the bed about 11:30 or 12:00 o'clock and he got mad and got up and started fussing and put the rod in the fire. He said he had been beating me and beating me and that didn't do any good and he would burn it out of me, and he went and got the rifle and stood the rifle up there and told me to take off my gown, he didn't want to burn my gown, and that if I run he would shoot me, and when the rod got hot he got it and burned me all on the arms and back and told me he was going to burn my eyes out and I got under the bed trying to get away from him and he kept jugging me on the legs and burning me and I got out." She further said that the burning process consumed some fifteen to twenty minutes; that the "* * * iron would get cool and that he would go put it back in the fire and heat it again." These burns were made with this hot iron upon a large part, if not most, of her body. There were eighty-four of them. She begged him to desist but he continued. She screamed with pain, awaking the children. She further testified "he said he had been beating on me and beating on me and that didn't do any good and he was going to burn me, told me to pull my gown off, he didn't want to burn it." Told her to give him the money or "he would burn her up." She told him she had no money. He threatened to throw her into the open fire. She was afraid to tell anyone because of defendant's threats. She treated her burns with ungentine. The trial of this case took place April 17, 1954, a year and two months after the burns were made. This witness exhibited the burned places and scars to the jury. This crime occurred Saturday night. Sunday night following defendant came home very angry and proceeded to break into the house. His wife shot him with the rifle. She says she shot him because he said that when he returned he would throw her into the fire and burn her up. She was tried for and acquitted of that shooting.

Henry Harrison testified he was at the Golden home on Monday night after Jessie May had shot defendant. He described her wounds, supporting what she said about the number and extent of the burns.

Pink Harrison, son of Henry Harrison, was also there that night. He gave, in substance, the same testimony as did Henry about the nature and extent of the burns.

Wilson Bingham was the jailer. Jessie May was brought to the jail Monday night for shooting defendant. He and his wife saw the burned places on her body. He said she had burns and blisters "from her neck plum down to her waist line"; that she had eighty-four burns upon her body, all appearing to have been made within the previous three or four days. Her clothes were sticking to her body.

Dr. Riddell testified that on Tuesday morning the sheriff requested him over the telephone to examine Jessie May. He did that in jail. He said "I found multiple areas of second degree burns scattered all over her body"; that he did not see any burns he would describe as third degree burns; that he was much impressed by the number of burns. Some were more serious than others. "One would be about the size of your finger and another would be about the size of two fingers and so on." He said a second degree burn would raise blisters. They are "* * * into the skin, but not down below the skin; it didn't burn much past the skin in other words." He said the burns he saw were very serious; that they can prove fatal "if enough of them are there * * * ." He was asked on cross examination what percentage of the body would have to be covered by the type burns he saw to be fatal to the victim. He replied "It depends on the kind of medical care you get. It would be around fifty to sixty percent. At any time you denude enough skin from the body it can be fatal from loss of blood, serum and so forth." He did not prescribe for the patient. His mission was to examine her burns. He said the wounds "could have been

made by use of the iron rod "or an instrument of this type." Here the State rested.

The defendant put on this evidence:

Lula Golden, the mother of defendant, said she was at the Golden home Monday night after defendant was shot; that Jessie May Golden said nothing to her about being burned; that she, Jessie May, was wearing a blouse and skirt.

Alec Eiland was 83 years of age. He was a grandfather of defendant. He said he saw Jessie May in the municipality of Kilmichael after she claims defendant made burns upon her body and that Jessie May said she had not been burned. However, on cross examination he said he did not remember the day nor the month this conversation took place. He said "I think it was last year." Then he said he did not know whether it was the current year or "last year" and finally said he thought it had been about six months.

William Holmes testified he lived about three miles from Kilmichael; that on Saturday night, February 21, 1953, defendant came to his house between nine and ten o'clock and awakened him and said he had run his automobile into a ditch and wanted the witness to help pull him out; that he, Holmes, got up and went to the scene in his truck but was unable to pull the car back into the road; that witness carried defendant to the home of Joe Eiland and defendant went into the Eiland home. Witness did not see defendant again that night. However, on cross examination witness was uncertain as to when this occurred. He said "I think it was along in February." He then said it could have been the first, second or third Saturday in February.

Joe Eiland, uncle of defendant, testified that the defendant came to his home "late over into the night" of February 21, 1953, and spent the night, leaving about five o'clock in the morning. That he did not know why he came; that he lived about six miles from defendant's

home. That was the only time defendant ever spent the night at the home of the witness.

Columbus Golden was the father of defendant. Defendant and family lived upon the farm owned and occupied by the witness. This witness and one of his counsel, sometime after the occurrence here, went to the home of defendant, and the witness made a sketch, or plat, of the house and the room arrangement therein, with measurements. However, this appears to have been directed largely to the location of the bullets made by the shooting on Sunday night. The floor plan of the house made by this witness was introduced into evidence without objection.

G. L. Golden, the defendant, testified. He simply denied that he was at home the night of February 21, 1953. He said his car ran off the road; that he went to the residence of William Holmes; got him up; Holmes tried to get the car onto the road without success; that he, defendant, spent the night at Joe Eiland's, his uncle; went home Sunday morning. He then went into the affair which occurred Sunday night. Said he was forcing open a window in the home when his wife shot him; he described the scuffle between them. He was unable to explain his whereabouts on Saturday afternoon and did not know where he was on the Friday night before; said he had never before seen the wagon iron or poker. He admitted that at the April 1953 term of the circuit court he had been convicted "on another charge" and sentenced to the state penitentiary for four years; that he had appealed this case to the State Supreme Court, which had affirmed his conviction (71 So. 2d 476) and that he was then awaiting departure to begin that penal sentence.

Columbus Golden, recalled, said defendant was at his house Monday night until arrested. He exhibited a bullet he said he found in the house. This was supposed to have been fired by Jessie May Sunday night. That was the evidence for the defendant.

J. W. Herring, the sheriff, was called by the State in rebuttal. He said Henry Harrison went with him to the scene Sunday night and that Harrison went into the house where Jessie May was. This was in rebuttal of the testimony of one witness for the defendant to the effect that Harrison never went into the house and, therefore, did not see any burns upon the body of Jessie May as Harrison had testified.

It is evident at once that whether defendant or some other person inflicted these physical tortuous acts was a question for the jury. That tribunal decided they were inflicted by defendant and the evidence amply supports that finding.

But appellant urges that the proof is insufficient to sustain the finding of the jury that he had any intent to kill Jessie May Golden. A number of elements and factors enter into that question.

What he said is important. He said he would burn her eyes out. Again he said he would burn her up. He threatened to throw her into the fire. These statements, or threats, showed the extent to which, in his own mind, he would, or might, go.

The hot iron, as he used it, might have resulted in death. The doctor said that. Too, it would seem just a matter of common sense that eighty-four applications to the naked body of a red hot poker, or iron, might produce death — not immediately, perhaps, but as a result of complications resulting from those acts. Defendant is chargeable with knowledge of the likely ultimate result of his acts. So far as he knew he had done enough to bring about her ultimate death. Whether the instrument, as here used, might ultimately produce death was a question for the jury. Blakely v. State, 165 Miss. 503, 144 So. 864; Blaine v. State, 196 Miss. 603, 17 So. 2d 549; Bolin v. State, 209 Miss. 866, 48 So. 2d 581; Smith v. State, (Miss.) 49 So. 2d 244. The fact that he did not actually then and there kill his victim is not determinative of the question. In Ceary v. State,

204 Miss. 299, 37 So. 2d 316, defendant shot his victim once, without killing him, and could have, but did not, shoot him again. The same contention was there made as is now urged in this case. The court pointed out that the accused might have thought he had killed his victim, or that what he had done was sufficient to produce that result, and that the jury ought to be left free to weigh all the circumstances bearing upon whether the weapon, used in the method shown, might produce death. Likewise here defendant might have thought he had done enough to eventually take the life of Jessie May Golden. In Blakely v. State, supra, the accused, instead of shooting the prosecuting witness, used the gun as a bludgeon to hit him upon his head. This Court held that intent was a question for the jury.

In Rogers v. State, (Miss.) 68 So. 2d 105, accused cut his victim with a knife. He did not kill him. He might have cut him again and killed him on the spot but he did not do so.

He contended that the fact he only cut him once "when there was nothing to prevent his doing so again would disprove such felonious intent." He cited a number of cases, as will be seen from a review of that case, to sustain his contention.

This Court disposed of the contention in this language: "It is urged on behalf of the appellant that since he cut Randolph one time with his pocket knife, and there was nothing which would have prevented him from continuing his assault until he had killed Randolph, if he had desired to do so, he could not be guilty of assault and battery with intent to kill and murder. As to this contention see the case of Ceary v. State, 204 Miss. 299, 37 So. 2d 316, wherein this Court held that there was no error in the court's refusal to grant the defendant an instruction to the effect that if the jury believed from the evidence that the defendant had another load in his gun, and could have used it and killed his alleged victim, if he so desired, but did not do so because he did not

want to kill him, the jury should take this into considera-
tion along with all the facts and circumstances in the
case in determining whether the defendant did intend to
kill and murder the prosecuting witness. We held that
this amounted to a comment on the weight of the evi-
dence as to whether or not the defendant shot with the
intent to kill and murder; and we called attention to the
fact that this instruction would not have left the jury al-
together free to consider the very pertinent fact that the
accused may have had good reason to believe that he had
already killed the deceased. In the Ceary case, supra, we
overruled the case of McCaa v. State, Miss., 38 So. 228, to
the contrary and said: 'The test under such circum-
stances is whether or not the accused intends to kill and
murder at the time he fires the shot or otherwise inflicts
the wound, and if such intent then exists he is not to be
exonerated of the felonious charge by what he does or
fails to do thereafter.' (204 Miss. 299, 37 So. 2d 317.)
We are therefore of the opinion that the accused in the
case was not entitled to a peremptory instruction on the
issue of whether or not he cut the prosecuting witness
with intent to kill and murder.''

The intent of defendant in the case at bar was a ques-
tion for the jury under the proof and existing circum-
stances.

 ██ The court granted the State the following in-
struction: ''The court instructs the jury for the State of
Mississippi, that if you believe from the evidence in this
case beyond a reasonable doubt that the defendant, G. L.
Golden, at the time testified to by the witnesses in this
case, did willfully, unlawfully and feloniously make an
assault and battery upon the person of Jessie Golden
with a certain deadly weapon, to wit, a hot iron wagon
rod or poker, with force and means likely to have pro-
duced death, by then and there burning her body with
said hot iron wagon rod or poker, without authority of
law and not in necessary or apparently necessary self
defense, and with the intent then and there willfully, un-

lawfully and feloniously, and of his malice aforethought, to kill and murder the said Jessie Golden, a human being, then it is your sworn duty to find the defendant guilty as charged, and the form of your verdict may be: 'We, the jury, find the defendant guilty as charged.' "

Appellant says this instruction told the jury the hot iron was a deadly weapon. We do not so construe the instruction considered as an entirety. The nature of the weapon, as well as the felonious assault, were facts to be determined and found by the jury "from the evidence in this case beyond a reasonable doubt * * * ."

Besides, other granted instructions made it perfectly clear that whether the iron as here used was or was not a deadly weapon was a question for decision by the jury.

Affirmed.

*Hall, Kyle, Arrington* and *Gillespie, JJ.,* concur.