5/20/97

IN THE COURT OF APPEALS

OF THE

STATE OF MISSISSIPPI

NO. 95-KA-00263 COA

MELISSA LAUREL GARRISON

APPELLANT

v.

STATE OF MISSISSIPPI

APPELLEE

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND

MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-B

TRIAL JUDGE: HON. JERRY O. TERRY

COURT FROM WHICH APPEALED: HARRISON COUNTY CIRCUIT COURT

ATTORNEY FOR APPELLANT:

DONALD J. RAFFERTY

ATTORNEY FOR APPELLEE:

OFFICE OF THE ATTORNEY GENERAL

BY: SCOTT STUARTDISTRICT ATTORNEY: CONO CARANNA

NATURE OF THE CASE: CRIMINAL: MURDER

TRIAL COURT DISPOSITION: CONVICTED AND SENTENCED TO LIFE IMPRISONMENT

MOTION FOR REHEARING FILED:6/3/97

CERTIORARI FILED: 8/12/97

BEFORE BRIDGES, C.J., HERRING, AND PAYNE, JJ.

HERRING, J., FOR THE COURT:

Melissa Garrison was convicted of murder and sentenced to life imprisonment for her involvement in the death of her mother, Elizabeth Phelps Garrison, also known as Betty Garrison. Three earlier trials had ended in a mistrial when the jury was unable to agree on a verdict. Melissa's sister, Shannon, and Allen Robert Goul previously pled guilty to the murder and received life sentences. Feeling aggrieved with the jury verdict, Melissa appeals. Finding no error, we affirm the judgment of the lower court.

FACTS

Betty Garrison was murdered in her bedroom in the early morning hours of July 7, 1992. Melissa admitted that she was a witness to her mother's killing but denies participating in it. Melissa also admitted to making derogatory statements about her mother to Allen Goul but denied ever seriously considering killing her mother.

There is no question that Betty Garrison, a divorced mother with two teenage daughters, was having problems with her daughters. In an effort to maintain some control of her daughters, she installed alarms on the downstairs doors, disconnected most of the telephones and nailed shut her daughters' bedroom windows. The family was also in counseling and had gone to the counselor on the evening of the murder. Melissa Garrison admitted at trial that she sneaked out of the house on nine of thirteen nights in late June prior to her mother's murder.

In testimony offered by the defense, Melissa was portrayed as the peaceful, truthful daughter while Shannon was portrayed as violent and a liar. Both girls, particularly Shannon, had been vocal in their dislike for their mother and told others that they wished she was "gone." At trial, Melissa attempted to show that she was intimidated or controlled by her older sister.

Allen Goul moved into the neighborhood a few months prior to the murder and was Melissa's boyfriend. He had known Shannon before she introduced him to Melissa. At trial, Allen testified that Melissa asked him to find someone to kill her mother and that he had offered to do it. However, he said Melissa wanted him to find someone else. There was also evidence that Shannon contacted Allen about killing Betty Garrison. Ultimately, Allen came up with the plan to murder the deceased which was carried out.

On the day of the murder, Allen sent a note addressed to Shannon and Melissa, outlining "instructions step by step," including -- "At 3:15 dispose of body." The note to both sisters stated "if you don't want this done, tell me before I do anything. If anybody else show's [sic] up, they're gone to [sic]. Warning - You may get a little sick by watching, well just saying well gotta go." There was a second note to Melissa telling her "Tonight! Open the window at 2:30 or keep a look out for me walking on the street. I may be a little earlier. Be ready, O. K." The notes were left at the Garrison home in a cassette tape case and were given to Melissa by her mother around 8:00 P.M., after they had come home from family therapy. Both notes were later found in the front pants pocket of the shorts Melissa was wearing when she was taken into police custody.

When Allen arrived at the Garrison home at around 2:30 A.M., he testified that he asked Melissa if she was sure she wanted "this done," meaning the murder. Melissa responded by saying that Shannon was waiting in the other room. On the other hand, Melissa denied that she said anything. Melissa further denied that she knew what Allen was about to do, even though she had read both of his notes.

She maintained that she did not take Allen's plan to kill her mother seriously, although she admits that she followed Allen to her mother's bedroom. Allen testified that she led him to her mother's bedroom.

Shannon was already in her mother's bedroom and had purportedly gone there to sleep, after telling her mother that she was afraid because she saw a roach in her own room. On instruction from Allen, Shannon placed a pillow over her mother's head. Then, Allen stabbed Betty Garrison several times with a knife which he had brought and began to strangle her. Allen testified that Melissa began screaming and repeatedly yelled, "Is she dead yet? Kill her. Shut her up." At some point during the struggle, Allen asked that the bedroom lights be turned on. When this was done, he noticed that both girls were wearing gloves. According to Allen, when Melissa and Betty were screaming, Shannon whispered to her mother, "Mother, you're to die."

The cause of Betty Garrison's death was later found to be strangulation, and Allen sustained several scratches on his neck and chest as a result of his assault on Betty. After they were satisfied that Betty was dead, the three teenagers left the home on foot, disposed of the knife, some gloves and socks in a drainage ditch, and went to a friend's house. After getting a ride back to the Garrison home, the three of them took the Garrison family car and stopped at a Krystal diner on their way to find Shannon's boyfriend. There was testimony that the boyfriend, Michael Brewer, suggested that they should make it appear that there had been a robbery resulting in Betty's death.

After dropping the boys off in an alley near Allen's house, the girls then returned to the Garrison home and emptied Betty's purse on the bedroom floor. Melissa called 911, reported that there had been a robbery, and stated that her mother was seriously injured. When the police arrived, they immediately became suspicious of Allen, Shannon, and Melissa after an investigator noticed Allen standing outside the house with scratches on his neck.

At trial, Shannon was called to testify by the State. In response to the questions asked, she invoked her Fifth Amendment privilege against self-incrimination. The trial court threatened to hold her in contempt if she did not respond to questions since she had already pleaded guilty to murder. The court then declared that Shannon was an unavailable witness and allowed the State, over the strenuous objection of the defense, to introduce Shannon's former testimony, which was given under oath and in the presence of her attorney, at her guilty plea hearing. The court offered to allow the defense to cross-examine Shannon after she invoked her Fifth Amendment right, but the offer was declined.

Prior to accepting her guilty plea at a separate hearing, the court asked Shannon to give her version of the events leading up to and including July 7, 1993. Shannon stated that she and Melissa told Allen that they wished that their mother was dead, and Allen came up with the plan to kill their mother. Shannon testified that a few days prior to the murder, she wrote Allen a note asking for his help -- "We need help. We have to do it soon . . . . We don't want whoever to do it by themselves. We just need a little help." Shannon testified that on the night of the murder, Allen came into the bedroom and told her to put a pillow over her mother's face, and she did. Shannon stated that she did not know Allen had a knife until he stabbed her mother. She stated that her mother was then on the floor, and Allen began to strangle her. Shannon further stated that Melissa was screaming "kill her."

Herbert Wilson, Betty Garrison's boyfriend, testified that he saw Melissa at the Goul residence on the morning after the murder, and she said to him, "Please don't hate us for what we've done." Mildred

Phelps, Betty's mother and the grandmother of Melissa and Shannon, testified that when she saw Melissa at the detention center, Melissa said, "I'm sorry. I did it. How can you-all keep loving us." Bobby Phelps, Melissa's uncle, testified that when he saw Melissa at the detention center that the first thing she said was "How can you-all still love us after what we've done. Oh, please don't let them hang me. I'm scared."

On appeal Melissa raises several issues, which are listed in various forms. The following issues are as listed in her argument:

I. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ALLOWING INTO EVIDENCE OUT-OF-COURT STATEMENTS MADE BY CO-DEFENDANT SHANNON GARRISON. ARE THESE STATEMENTS IN VIOLATION OF THE CONFRONTATION CLAUSES OF THE UNITED STATES CONSTITUTION AND OF THE MISSISSIPPI CONSTITUTION, THE MISSISSIPPI RULES OF EVIDENCE.

II. THE TRIAL COURT ERRED IN FINDING THAT MELISSA WAS PARTY TO A CONSPIRACY TO COMMIT MURDER.

III. THE TRIAL COURT'S DENIAL OF MELISSA'S MOTION TO RECUSE ITSELF WAS IN ERROR.

IV. THE TRIAL COURT ERRED IN REFUSING TO ALLOW MELISSA TO PRESENT EXPERT TESTIMONY IN HER DEFENSE.

V. THE TRIAL COURT'S ADMISSION OF THE HEARSAY STATEMENTS OF SHANNON GARRISON, ITS REFUSAL TO RECUSE ITSELF, AND ITS EXCLUSION OF EXPERT TESTIMONY CONSTITUTE REVERSIBLE ERROR.

VI. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY REFUSING MELISSA'S REQUEST TO SUBMIT AN ALTERNATIVE OFFENSE JURY INSTRUCTION.

We will discuss these issues one by one.

DISCUSSION

I. DID THE TRIAL COURT COMMIT REVERSIBLE ERROR BY ALLOWING INTO EVIDENCE OUT-OF-COURT STATEMENTS MADE BY CO-DEFENDANT SHANNON GARRISON. ARE THESE STATEMENTS IN VIOLATION OF THE CONFRONTATION CLAUSES OF THE UNITED STATES CONSTITUTION, THE MISSISSIPPI CONSTITUTION AND OF THE MISSISSIPPI RULES OF EVIDENCE?

Shannon Garrison took the witness stand at Melissa's trial and asserted her Fifth Amendment right against self incrimination in response to the State's questions. Thereafter, the State offered into evidence a transcript of Shannon's sworn statement which was given at the time she entered her own guilty plea to her mother's murder. After being properly advised of the nature and consequences of her pleading guilty, Shannon's statement was made to the trial court under oath and in the presence of her attorney during the course of proceedings in which the court was called upon to determine if her

plea was free and voluntary. Shannon's statement, in which she clearly implicated herself, along with Allen Goul and Melissa as participants in the murder, was transcribed by the court reporter. Over the objection of defense counsel, the transcript of Shannon's statement was admitted by the trial court into evidence at Melissa's trial, based upon the provisions of Mississippi Rules of Evidence 804(b)(3) and (5).

Rule 804(b)(3) provides that such a statement is admissible if the declarant is "unavailable" as a witness and if it is:

[a] statement which was at the time of its making so far contrary to the declarant's pecuniary of proprietary interest, or so far tended to subject him to civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

M.R.E. 804(b)(3). Rule 804(b)(5) is a catchall hearsay exception which provides for admission of "[a] statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness . . . ." M.R.E. 804(b)(5).

Shannon's statement during the course of her guilty plea was made to the same trial judge who conducted Melissa's trial and, as stated, was made under oath in the presence of her attorney. Thus, the trial judge was in an excellent position to observe Shannon while she made her statement and determine the trustworthiness of what she was saying. Undeniably, Shannon implicated herself, as well as Allen Goul and her sister, as major participants in the murder. At no time did Shannon attempt to lessen her own responsibility in regard to her mother's death or shift the blame solely to Melissa. It is noteworthy that at Melissa's trial, Allen had previously testified to essentially the same set of facts as shown in Shannon's statement, prior to the transcript of the statement being offered into evidence. Finally, Shannon was never offered, nor did she receive, any leniency in exchange as a result of the use of her statements at Melissa's trial. Likewise, Allen Goul received no lenience as a result of his testimony.

Melissa asserts that her right to confront and cross-examine Shannon, pursuant to the Sixth Amendment to the United States Constitution and the Mississippi Constitution of 1890, Art. III, 26, was violated when Shannon's statement was offered into evidence.Melissa's counsel was offered the opportunity to attempt to cross-examine Shannon after she asserted her Fifth Amendment rights, but he declined to do so. Thus, because of Shannon's refusal to testify, competing constitutional rights -- the right to avoid self-incrimination versus the right to confront one's accusers -- are placed in conflict. This situation is not unique and has been addressed on a number of occasions by the Mississippi Supreme Court, by the United States Supreme Court and by other Federal courts. In *Hansen v. State*, 592 So. 2d 114, 134 (Miss. 1991), the Mississippi Supreme Court stated: "The fact that a witness 'claims the fifth' does not *per se* mean the accused's confrontation rights have been abridged . . . ." In *Williams v. State*, 667 So. 2d 15 (Miss. 1996), the court acknowledged the preeminence of the Sixth Amendment Confrontation Clause when it ruled that statements such as Shannon's may be "precluded where they lack indicia of reliability and trustworthiness." *Id.* at 21.

In *Williams*, our supreme court squarely addressed the issue of whether a statement such as Shannon's, which would otherwise be admissible pursuant to Mississippi Rule of Evidence 804(b)(3),

should nevertheless be excluded as violative of the Confrontation Clause which is firmly embedded in our United States and Mississippi Constitutions:

The United States Supreme Court has held that reliability can be inferred "where the evidence falls within a firmly rooted hearsay exception . . .," otherwise, there must be "a showing of particularized guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. at 56, 100 S.Ct. at 2534. A majority on the United States Supreme Court has yet to conclude that Rule 804(b)3 falls within a firmly rooted hearsay exception. *See Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed. 2d 514 (1986). Therefore, the statement . . . must contain particularized guarantees of trustworthiness.

The Court has stated that "'particularized guarantees of trustworthiness' must be shown from the totality of the circumstances . . .," including only those relevant circumstances that surround the making of the statement and that "render the declarant worthy of belief." *Idaho v. Wright*, 497 U.S. 805, 819; 110 S.Ct. 3139, 111 L.Ed 2d 638 (1990). The Court also stated that "if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, then the hearsay rule does not bar admission of the statement at trial." *Id.* at 820, 110 S.Ct. at 3149.

*Williams*, 667 So. 2d at 21.

An examination of the totality of the circumstances in this case convinces this Court that there were particularized guarantees of trustworthiness and reliability in regard to Shannon's statement such as not to offend the Confrontation Clause. The statement was made under oath, in the presence of her counsel, and was made under such circumstances where there was limited motive for fabrication. Unlike the usual situation, Shannon did not attempt to implicate someone else in an attempt to avoid prosecution, to shift the blame, or to receive favorable treatment.

Neither case law nor the Rules of Evidence requires us to make an extensive analysis of the evidence in this case to determine whether Melissa was potentially harmed by Shannon's statement, as the dissent does. Unquestionably, the statement given by Shannon bolstered and corroborated other testimony in the case or it would not have been offered by the State. Possible prejudice to Melissa is not the standard by which we review the issue before this Court. At issue is whether the trial judge abused his discretion in concluding that the statement entered into evidence was against the declarant's penal interest and/or had sufficient indicia of reliability to meet the requirements of admissibility under Rule 804(b)(3) and (5).

As previously noted, the trial court was uniquely situated to make the determination that the statement fell within the exceptions of Rule 804(b)(3) and (5), and we will not disturb a trial court's ruling on the admissibility of evidence except where there has been a clear abuse of discretion. *Davis v. State,* 684 So. 2d 643, 661 (Miss. 1996); (Miss. 1992); *Shearer v. State*, 423 So. 2d 824, 826 (Miss. 1983). Moreover, Melissa implicated herself in the crime in the statements which she made to others after she was taken into custody. Thus, we hold that the trial court correctly admitted Shannon's statement into evidence.

II. DID THE TRIAL COURT ERR IN FINDING THAT MELISSA WAS PARTY TO A CONSPIRACY TO COMMIT MURDER?

Melissa argues that the court erred when it permitted Michael Brewer to testify as to what Shannon told him in Melissa's presence concerning plans when the girls returned home. The following is the testimony:

Q. Mr. Brewer, I had ask you whether or not Shannon made a statement to you in the car with Melissa and Allen and yourself on the way back to the Garrison residence from the Gulfport High track.

A. Yes, sir.

Q. And what was that statement?

A. Shannon stated to me that when they returned to their house, that she was going -- they were going to have Melissa call 911 and act hysterical and say they found their mother.

Mississippi Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if it is "a statement by a co-conspirator of party during the course and in furtherance of the conspiracy." M.R.E. 801(d)(2)(E). Melissa cites *Krulewitch v. United States,* 336 U.S. 440 (1949), which is cited in the comment to Rule 801, as support for her position that the conspiracy to murder Betty Garrison was complete at the time the statement was made and therefore not within the nonhearsay exception. In *Krulewitch*, the United States Supreme Court found that it was error to admit testimony concerning statements made by a co-conspirator one and a half months after an abduction, which was the subject of the conspiracy that had taken place. In *Krulewitch*, the Government argued that the statements should have been admissible since the statements were made in furtherance of a continuing subsidiary conspiracy to conceal the crime or "the implied agreement to conceal." *Id.* at 443 (quoting *Krulewitch v. United States*, 167 F.2d 943, 948 (2d Cir. 1948)).

Betty Garrison was murdered around 3:00 A.M. The statement by Shannon was made to Michael Brewer sometime prior to 6:00 A.M. on that same day. At the time Shannon made the statement to Michael in Melissa's presence, the participants had not completed their original plans and were still within the course of and in furtherance of their objectives. Logically, a conspiracy ends when the participants have been separated by time or place from the events which comprise the objectives of the conspiracy. However, concealment was part of the original plan set out by Allen and implemented by Shannon and Melissa.

In *United States v. Del Valle*, 587 F.2d 699, 704 (5th Cir. 1979), the court stated that "concealment is sometimes a necessary part of a conspiracy, so that statements made solely to aid the concealment are in fact made during and in furtherance of the [original] conspiracy." *See also United States v. Esacove*, 943 F.2d 3, 5 (5th Cir. 1991); *United States v. Alvarez*, 610 F.2d 1250, 1254 (5th Cir. 1980). Under such circumstances, statements made by a co-conspirator are admissible. In the case *sub judice*, Shannon informed Michael that part of the plan was for Melissa to call 911 in furtherance of their original conspiracy. In an attempt to cover up their crime, Melissa did in fact call 911 and informed the listener that her mother had been injured. Thus, the *Krulewitch* case does not apply in this case, and we hold that Shannon's statement to Michael was admissible. *See also United States v. Blakey*, 960 F.2d 996, 998 (11th Cir. 1992), *United States v. Griggs*, 735 F.2d 1318, 1325 (11th Cir. 1984).

Under this assignment of error, Melissa also argues that the court erred in excluding other evidence offered in her defense. Melissa asserts that the court would not allow her to question Officer Danny Holloway about his investigation of Shannon's plans to kill her mother. The court did not permit Holloway to testify about statements Shannon made to third parties prior to the night of the murder. In refusing to allow such testimony, the trial court correctly characterized this proposed testimony as "double hearsay." Melissa did not show that this testimony was either relevant or admissible. Unlike the statements made to Michael Brewer, the statements did not specifically concern Melissa, were not made in Melissa's presence, and did not concern immediate plans related to the murder of Betty Garrison. Thus, the excluded statements concerned only Shannon, who was not on trial in this case.

Melissa also complains that the court would not allow Allen Goul to testify as to a conversation he had with Shannon on the afternoon prior to the murder. Defense counsel asked, "And isn't it a fact that Shannon told you that she and Melissa were desperate?" The trial court sustained the State's objection. In urging this ruling to be error, Melissa makes no clear argument for the admissibility of the answer to the question posed under any hearsay exception. Without a clear basis for the admission of the testimony, the court was justified in its ruling. Like other proposed testimony, this testimony related to Shannon's conduct and not Melissa's.

We find no reversible error in the trial court's evidentiary rulings under this assignment of error.

## III. WAS THE TRIAL COURT'S DENIAL OF MELISSA'S MOTION TO RECUSE ITSELF IN ERROR?

The trial judge denied Melissa's pre-trial and post-trial motions that he recuse himself from the case. Melissa argues that the trial judge's statements at Shannon's plea hearing would cause a reasonable person to doubt his impartiality. Melissa also asserts that the trial judge displayed a pattern of bias against her at other proceedings prior to the trial and in the evidentiary rulings at trial. Melissa states: "After two plea hearings, two sentencing hearings, post-sentence appeals by Shannon and Allen, three murder trials, three hung juries, pervasive, incessant media coverage, and nearly three years, this trial judge had simply become too familiar with this case to be impartial."

The propriety of a judge sitting on a case is subject to review under the manifest abuse of discretion standard. *Green v. State*, 631 So. 2d 167, 177 (Miss. 1994); *Rutland v. Pridgen*, 493 So. 2d 952, 954 (Miss. 1986). In *Green v. State*, the Mississippi Supreme Court stated:

A presumption exists "that a judge, sworn to administer impartial justice, is qualified and unbiased. To overcome the presumption, the evidence must produce a 'reasonable doubt' (about the validity of the presumption)[.]" *Buchanan* [*v. Buchanan*], 587 So. 2d at 896, quoting *Turner v. State*, 573 So. 2d 657, 678 (Miss. 1990). When a judge is not disqualified under the constitutional or statutory provisions, "the propriety of his or her sitting is a question to be decided by the judge and is subject to review only in case of manifest abuse of discretion." *Ruffin v. State*, 481 So. 2d 312, 317 (Miss. 1985).

*Green,* 631 So. 2d at 177.

Melissa urges that disqualification was specifically required by Canon 3(c)(1)(a) of the Code of Judicial Conduct, which states:

(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

(a) he has a personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceedings . . . .

The general standard for recusal is "whether the judge has sufficient connections with parties or preconceived opinions regarding a case so that he could not fulfill the role of judge in deciding it." *Nicholson ex rel. Gollot v. State*, 672 So. 2d 744, 725 (Miss. 1996) (citing *Cantrell v. State*, 507 So. 2d 325, 328 (Miss. 1987)).

Melissa's original motion was based on the following finding made by the trial judge at Allen Goul's guilty plea hearing:

I'm satisfied that you are in fact guilty of the murder of Elizabeth Phelps Garrison on July 7, 1992. That you went to the home with the deliberate plan to murder Mrs. Garrison with the use of a knife, that this plan was carried out with the participation of Melissa and Elizabeth (Shannon) at that time, and that you did in fact effect the death of Elizabeth Phelps Garrison before you left . . . .

Under Rule 3.03(2) of the Uniform Rules of Circuit Court Practice then in effect, the trial judge was required to voir dire Allen as to the factual basis for his plea of guilty prior to accepting the plea and imposing sentence. Melissa contends that the trial judge was not required to recite into the record the factual basis for his ruling, but only that a factual basis existed. Melissa terms the judge's assertion that she participated in the plan to murder her mother as "pure and simple, an opinion."

Clearly, the trial judge's acceptance of Allen's plea of guilty and the finding upon which he rendered his ruling, incident to his judicial duty, cannot be categorized as an expression of personal opinion, nor does it factually support a claim of bias. Based on the testimony of Allen at his plea hearing, the finding of the trial judge was not manifestly wrong in the context of that hearing. Although there was no requirement under Rule 3.03 compelling the judge to recite the factual basis supporting the acceptance of a guilty plea, the fact that the judge recited the basis for his findings should not expose himself to claims of personal bias or prejudice in subsequent related proceedings in the absence of manifest abuse of discretion. No such abuse of discretion is apparent in this case.

In an attempt to further show that the judge was biased and should have recused himself, Melissa also offers on appeal the findings made by the court at Shannon's plea hearing and various evidentiary rulings made during the course of the trial. This evidence was not presented to the court in support of the motion for recusal, thereby making it questionable whether this Court should consider these matters which were never brought to the trial judge's attention for his consideration. *Robinson v. State*, 662 So. 2d 1100, 1104 (Miss. 1995).

In addition to the motion for recusal prior to trial, Melissa also moved the judge to recuse himself after the verdict was entered. In this motion, Melissa faults the judge for talking to the jury outside the presence of defense counsel and for stating at the sentencing hearing, "I'm satisfied that the jurors in this case reached the proper verdict . . . ." Once again, the evidence produced does not overcome the presumption that the judge was impartial or that he abused his discretion in denying the motion. We decline to reverse the judgment of the trial court on these grounds.

IV. DID THE TRIAL COURT ERR IN REFUSING TO ALLOW MELISSA TO PRESENT EXPERT TESTIMONY IN HER DEFENSE?

Melissa argues that the trial court denied her the opportunity to present expert testimony on her behalf. She contends that the court should have allowed the testimony of Dr. Joseph Tremontana. This testimony was excluded in a prior trial, at which time a proffer of the testimony was made. Defense counsel renewed this proffer in the current trial.

Melissa attempted to call Dr. Tremontana, a clinical psychologist, on the question of Melissa's intent and whether Shannon's dominance of Melissa was sufficient to overcome Melissa's free will. Dr. Tremontana saw Melissa as a patient on one occasion when she was six years old. He had been seeing Betty Garrison as a patient for several years and administered a number of tests to Melissa prior to her trial. Based on the proffer, Dr. Tremontana would have testified that Melissa was intimidated by her older sister and that Melissa did not take Shannon's talk of killing their mother seriously. According to Dr. Tremontana, Melissa "didn't know it would really happen until she heard her mother screaming."

The trial court did not allow the testimony because the doctor's report dealt with Melissa's mental state after the alleged crime and therefore was not a subject for expert opinion. The court noted that the insanity defense was not raised and that Dr. Tremontana had not treated any of the family members near the time of the murder. Moreover, many of Dr. Tremontana's observations were based on treatment that ended in 1987, and were recorded by another psychologist in his office. Mississippi Rule of Evidence 702 provides that expert testimony should be allowed if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." M.R.E. 702. However, the relevancy and admissibility of evidence are largely within the discretion of the trial court, and will not be reversed except where the discretion has been abused. *Roberson v. State*, 595 So. 2d 1310, 1315 (Miss. 1992). Melissa argues that the most damning evidence the State produced regarding her criminal intent was the testimony presented by Shannon and Melissa that Melissa wanted her mother "gone" and that she was aware that Shannon was talking about killing their mother. Melissa contends she had the right to rebut this testimony through the opinions of Dr. Tremontana.

In support of its decision to exclude the testimony of Dr. Tremontana, the trial court relied on *Taylor v. State*, 452 So. 2d 441 (Miss. 1984) and *Newell v. State*, 308 So. 2d 68 (Miss. 1975). In *Newell*, the supreme court stated:

The intention of a party is a fact determination to be made by the jury from the evidence. In arriving at this determination it has the duty to consider the testimony concerning the assault, the surrounding circumstances, including the expressions made by the participants. To permit comment on the subjective intentions of an accused by a witness based on conclusions reached from his observation invades the province of the fact finders. The issue of intent must be decided by the jury from the evidence in the case and not the conclusions of others. *Shanklin v. State*, 290 So. 2d 625 (Miss. 1974), and *Golden v. State*, 223 Miss. 649, 78 So. 2d 788 (1955).

*Newell*, 308 So. 2d at 73.

In *Taylor*, the Mississippi Supreme Court rejected the argument that expert testimony on the defendant's state of mind and ability to react to external events would aid the jury in its function as a

fact finder. The court stated: "Where insanity is not the defense, the determination of the ultimate fact of murder or manslaughter is left to the jury and is not subject to expert opinion testimony." *Taylor,* 452 So. 2d at 449 (citations omitted).

In this case, the trial court correctly concluded that to allow expert testimony "on the subjective intentions of an accused based on conclusions reached from his observation invades the province of the fact finder." Thus, we find that there is no merit to this assignment of error.

## V. DID THE TRIAL COURT'S ADMISSION OF THE HEARSAY STATEMENTS OF SHANNON GARRISON, ITS REFUSAL TO RECUSE ITSELF, AND ITS EXCLUSION OF EXPERT TESTIMONY CONSTITUTE REVERSIBLE ERROR?

The argument made under this assignment of error combines the arguments made under previous assignments of error concerning the admission of Shannon Garrison's statement, the trial judge's refusal to recuse himself and the exclusion of Dr. Tremontana's testimony. To these arguments are added questions of whether the State could have met its burden of proof in the case without Shannon's statement. Since this Court has determined that the lower court did not err in its evidentiary ruling concerning Shannon's statement or the motion for recusal, there is nothing in this assignment of error warranting further discussion. We note that Shannon's statement at her guilty

plea hearing only supported the testimony of Allen Goul and others and did not offer proof not found elsewhere in the State's case.

## VI. DID THE TRIAL COURT COMMIT REVERSIBLE ERROR BY REFUSING MELISSA'S REQUEST TO SUBMIT AN ALTERNATIVE OFFENSE JURY INSTRUCTION?

Melissa contends that the trial court erred in refusing to instruct the jury that it could consider whether or not to find her guilty of some crime less than murder. Melissa also claims the trial court should have granted her an instruction informing the jury that it could have found her guilty of manslaughter based upon culpable negligence, rather than finding her guilty of murder. It is noteworthy that Melissa offered a manslaughter instruction, which the trial court refused, during the first and second trials held in the case *sub judice*. However, no manslaughter instruction was requested by Melissa in the current trial. Thus, Melissa is precluded from raising, for the first time on appeal, the claim that a manslaughter instruction should have been given. *Ballenger v. State*, 667 So 2d 1242, 1252 (Miss. 1995). Contrary to Melissa's contention that the instructions refused in prior trials of this action were "carried over" and therefore refused in the present trial, there is no order in the court papers of the present trial indicating that such is the case. Moreover, there is no evidence in the record to justify a manslaughter conviction based upon culpable negligence. In this case, Melissa was present in the home at the time of the murder, and there is absolutely no evidence that she was negligent in her actions leading to the death of her mother. Thus, a manslaughter instruction would not be appropriate. *Porter v. State*, 616 So. 2d 899, 909 (Miss. 1993).

Regarding, Melissa's contention that she should have been granted an accessory after the fact instruction, we first review the instruction itself. In the trial on appeal, Melissa offered instruction D-5 as follows:

The Court instructs the jury that an accessory after the fact is one who conceals, receives, relieves,

aids or assists any person, knowing that such person has committed a felony, with intent to enable such person to escape or avoid arrest, trial, conviction or punishment, after said person had completed the commission of such felony.

The Court further instructs the jury that Melissa Laurel Garrison is not required to establish that she was an accessory after the fact to your satisfaction, but if the evidence or lack of evidence in this case raises in your mind, the mind of the jury, a reasonable doubt as to whether or not the Defendant was only an accessory after the fact, then in that event, you must give the Defendant, Melissa Laurel Garrison the benefit of the doubt and may not convict Melissa Laurel Garrison of the crime of murder and therefore it would be your sworn duty to return a verdict of not guilty of murder.

The instruction was refused by the trial court as shown on page 1340 of the transcript which reads as follows:

MR. CARANNA: Judge, just in terms of D-5, we object to it on the -- in that it is not an instruction suggested by *Gangl* but merely a statement that the Court projected in ruling on C-10.

THE COURT: All right. I'm going to take the position that it's -- that it's an improper instruction as to the crime upon which she is being charged. There is no lesser included offense, or accessory after the fact is not a lesser included offense to the crime of murder, and that such an instruction would be an undue comment by the Court on the evidence that's been produced. I'm going to refuse it.

Thus, the issue arises as to whether the jury should have been permitted to consider whether Melissa was not guilty of murder but was guilty of the lesser offense of accessory after the fact.

The instruction offered by Melissa is similar to an instruction approved by our supreme court in *Gangl v. State*, 539 So. 2d 132, 135 (Miss. 1989). In *Gangl*, the court stated:

The better rule in cases such as this is that the defendant may request an instruction regarding any offense carrying a lesser punishment if the lesser offense arises out of a nucleus of operative fact common with the factual scenario giving rise to the charge laid in the indictment.

*Gangl*, 539 So. 2d at 136 (citations omitted). Moreover, the Mississippi Supreme Court has held consistently that lesser included offense instructions "should not be indiscriminately granted and that they should be submitted to the jury only where there is an evidentiary basis in the record for them." *Harper v. State*, 478 So. 2d 1017, 1024 (Miss. 1985).

"An accessory after the fact is a person assisting one who has completed the commission of a felony to avoid being apprehended, arrested, convicted, etc." *Chase v. State*, 645 So. 2d 829, 851 (Miss. 1994) (citing *Lee v. State,* 469 So. 2d 1225, 1230 (Miss. 1985)). In this case, Melissa admitted to being in the home before and at the time the murder was committed. Her admission made her a principal to the crime. The trial court was correct in refusing instruction D-5 presented at trial.

CONCLUSION

In rendering today's decision, we have carefully reviewed the record in all of the trials involved in this action. Based on our review of the facts as shown in the transcript, all of the instructions and the

other court papers, as well as the law applicable to this matter, we conclude that the judgement of conviction entered herein should be affirmed.

**THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE TO LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO HARRISON COUNTY.**

**BRIDGES, C.J., KING, PAYNE, JJ., CONCUR. SOUTHWICK, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY MCMILLIN, P.J., AND COLEMAN, J. THOMAS, P.J., DIAZ AND HINKEBEIN, JJ., NOT PARTICIPATING.**

IN THE COURT OF APPEALS 5/20/97

OF THE

STATE OF MISSISSIPPI

NO. 95-KA-00263 COA

MELISSA LAUREL GARRISON

APPELLANT

v.

STATE OF MISSISSIPPI

APPELLEES

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND

MAY NOT BE CITED PURSUANT TO M.R.A.P. 35-B

SOUTHWICK, J. dissenting

The purpose of criminal trials is to permit the jury to reach the truth, as imperfectly as humans are capable of knowing truth. Evidentiary rules have been established to define the evidence that can properly be presented to a jury, and that which cannot. Some of those rules are of rather modern origin, but some have been of such long-standing as to be set out in our constitution. One of the most fundamental rules is the right of confrontation protected by the Sixth Amendment. Because I believe Melissa Garrison's right to confront the witnesses against her was violated, I respectfully dissent.

The majority finds that the statement made by Shannon Garrison when she pled guilty was properly

admitted as either a statement against interest, or as a statement with bedrock "guarantees of trustworthiness." M.R.E. 804(b)(3) & (5). I will look at each possibility in turn.

The evidentiary rule permitting introduction of a hearsay statement against interest, i.e., an out-of-court statement in which the declarant is not subject to cross-examination, is founded on the concept that the incriminating nature of such statements provides the necessary assurances of truthfulness and that cross-examination is unnecessary. Comment, M.R.E. 804(b)(3). There are exceptional situations in which that might not be true, but for the vast majority of occasions the psychology behind the rule would appear valid. The relevant rule is this:

(3) *Statement Against Interest.* A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true. . . .

M.R.E. 804(3).

The starting point here is that the part of the statement that is being contested on this appeal is not against the declarant's interest. The declarant was Shannon; the interest that the State wishes to use the statement against is Melissa's. The statement was given in open court, by a person about to be sentenced by the judge hearing the plea. The statement somewhat incriminated the witness, Shannon, but so minimally that at one point the trial judge said that he was not certain he could accept the plea as being an admission of guilt. She alleged that she had asked Allen Goul to stop smothering and strangling her mother. She refused to admit that she was in her mother's room in order to make certain that her mother was asleep, and said that the only reason that she remembered for being there was that there had been a bug in her room. It is also a fair reading that Shannon tried to place the principal blame on Goul.

The "against-interest" exception, with the inherent probability of truthfulness that flows from self-incrimination, just does not fit. Shannon Garrison had decided to plead guilty, and appeared to be admitting to as little of the crime as possible. The problem would be in sharper focus if the State had attempted to admit this same statement into evidence in a trial of Allen Goul. The prospect that she was shifting as much of the blame as possible to Goul is very real, a prospect that means there is no inherent reliability to her statements about him. I also believe that once the rationale for the rule is so clearly shattered regarding one of the targets of the statement, it cannot be pieced back together in part to allow admission of some statements against another target. One authority on the Federal Rules of Evidence has focused specifically on the problem of a "statement against declarant's penal interest inculpating accused." Jack B. Weinstein, 5 Weinstein's Federal Evidence 804.06[6] (Joseph M. McLaughlin ed., 2d ed. 1997). In a plea statement, the possibility exists "that the declarant sought immunity or hoped to be allowed to plead to a lesser crime in return for providing help to the prosecution in obtaining a conviction." Weinstein, 804.06[6][a] at 804-60. The "against-interest" rationale is inapplicable, the authors state, when there is a prospect that the "declarant is shifting blame to the accused to escape some of the onus." *Id.* at 804-64.

If blame-shifting occurred, it would appear to have been primarily towards Goul. Regardless, the opportunity and benefits of shifting blame are palpable. It is one thing to use the rule to admit the evidence against Shannon herself. Whatever blame she may have dishonestly shifted away, Shannon

was at least as guilty as the blame she retained. What is not authorized by the rule is admitting the statements to show the culpability of others when there was a reason for the declarant to blame others for part of what the declarant herself may have done.

The fact of a horrible murder cannot be ignored. But neither can the various evidentiary rules that allow juries to reach a fair estimate of the truth. If such a statement as Shannon's was to be introduced, when the declarant was not available to testify, it must only be because the statement was so inherently reliable as to be beyond the need for confrontation as guaranteed by the Sixth Amendment. That cannot describe the statement of a murderer, given during a guilty plea and before sentencing, when the benefits of spreading the blame for a crime as broadly as possible are too obvious to require mention. This evidentiary rule simply is inapplicable.

For the same reason, the catchall exception for statements with "equivalent circumstantial guarantees of trustworthiness" is factually unusable. M.R.E. 804(b)(5).There is also a special notice procedure set out in M.R.E. 804(b)(5). Since I do not believe that the statement has sufficient guarantees of trustworthiness to fit under the statement against interest exception, it does not become trustworthy just by giving it a new label.

This having been said, the admission of the statement is not reversible error if we are convinced that the error was harmless. When a constitutional right is involved, "reversal is required unless 'on the whole record, the error was harmless beyond a reasonable doubt.'" *Newsom v. State,* 629 So. 2d 611, 614 (Miss. 1993). To determine the effect of Shannon's statements, I will give a brief review of certain evidence at each of the four trials that were held.

Shannon pled guilty before Melissa's first trial. I find nothing in the record, however, that shows Shannon was called or her testimony used at the first trial.

At the second trial, the State put Shannon on the stand. By that time, she was apparently trying to withdraw her guilty plea. Invoking her Fifth Amendment right against self-incrimination, she refused to answer questions and further said that her lawyer earlier coerced her into pleading guilty. There was no attempt to introduce her plea statement.

At the third trial there was a confused, short session with Shannon on the stand in which she asks for a lawyer while the assistant district attorney is asking if she will "take the Fifth" if asked any questions. No questions ended up being asked.

Thus the first time the transcript of the guilty plea was introduced was at the fourth trial. All the other three trials did go to the jury, but no verdict could be reached.

In order to determine whether any harm arose from the one trial in which Shannon's plea statement was read, I will review other testimony at all the trials. Melissa testified at all four. At the first trial Melissa acknowledged she knew that Goul and Shannon had been talking about the murder for months, but she thought they were joking. She admits getting the clorox to clean her mother's fingernails in order to remove the blood and skin scratched from Goul, because Shannon told her to do so. She denied ever actually doing the cleaning. She admits to screaming, but does not think she said "kill her." She admits to putting the gloves on.

At the second trial Melissa testified that she got the murder notes from Goul taped to and inside a cassette box, gave them to Shannon to read, then took them back and forgot about them. She said Goul bragged a lot about things he really was not going to do. Shannon and Goul never told her that they were plotting to kill. Melissa assumed Goul was coming over for their nightly fornication, and she did not expect actual murder. She went with Goul into her mother's room, and had no idea what he had in mind. She started screaming when the suffocation started. She was in the hall until it was over, and then Shannon came out and told her to use the bleach. She took the bleach and toothbrush into the room, but could not use them. She admitted to putting on gloves. She also admitted that there were times that she told Goul that she wished her mother was dead, but she just meant she wanted her out of her life. Again there was a hung jury.

At the third trial Melissa testified in the same way.

At the fourth trial Shannon's plea was finally read. The following are the parts that refer to Melissa:

1) Melissa started screaming when the pillow was put over her mother's head;

2) Shannon said that "we" had been told Goul was coming over;

3) "we" had been told he was going to choke her;

4) Shannon told Goul that Melissa and Shannon both wanted their mother dead, and he devised the plan;

5) both girls wore gloves in order not to leave finger prints;

6) Melissa used the bleach to clean her mother's fingernails;

7) Melissa treated Goul's neck for the scratches;

8) Melissa was screaming "kill her"; and

9) after the murder everyone left the house to look for Shannon's boy-friend, and then spent some time with him in figuring out what to do.

If there was harm, it must be from one of the nine statements. It would be useful to know what parts of Shannon's statements were uncontroverted, and which were in issue. Melissa's testimony was firm that she had no idea the murder was really going to occur, and was little more than a distraught observer. A review of the nine items from Shannon's testimony reveals what was covered by other witnesses, and what was contested.

1) Everyone -- Melissa, Goul, and Shannon -- conceded that Melissa screamed and was mainly outside the room during the actual killing.

2) All concede that the Goul note told both girls that Goul was coming over to murder their mother; the only issue was whether Melissa believed that he was serious about this purpose.

3) Goul gave the most unambiguous testimony that Melissa knew the plan and wanted her mother dead, and Shannon's statement said the same. Melissa denies ever saying such, so this is controverted.

Goul said he asked Melissa as he came in the window -- "do you want this done" -- and she answered by saying Shannon was waiting with her mother.

4) How many times Melissa said she wanted her mother gone is something of an issue, but that Melissa said it some -- not really meaning it, she argues -- is agreed.

5) Melissa in all four trials admits wearing gloves, clearly in order to hide fingerprints.

6) That Melissa got the bleach to clean off her dead mother's fingernails is agreed. Shannon says Melissa did the actual cleaning. Goul says Melissa took the bleach into the bedroom, but he does not know if she actually did the cleaning. Melissa denied being able to do so.

7) Everyone agrees Melissa tended Goul's neck wounds.

8) Goul said that Melissa screamed "is she dead yet; kill her; shut her up." Shannon basically confirmed that, but Melissa denied doing any such thing.

9) All agree the conspirators left to find others after the murder.

What physically happened is not much in doubt -- the one question about the movements within the house concern whether Melissa actually used the bleach to destroy evidence. What Melissa said and what she knew are controverted. Before Shannon's testimony, the boy who did the actual killing, Goul, said Melissa was significantly involved. Melissa on the other-hand denied anything other than weak-willed observation of the event. One family-member witness quoted Melissa as saying at the jail "I'm sorry. I did it. How can you keep loving us." That "admission" could be seen by jurors as not all that incriminating, since it is clear she participated in some ways and may only have been despondent about a more limited role than the State was alleging. The admission was introduced at the other trials and the jury did not apparently find it conclusive.

Items 3, 4 and 8 are the problems. Though Goul testified that Melissa wanted her mother dead and encouraged them during the crime with words like "kill her," similar statements coming from Shannon corroborated what otherwise was uncorroborated. There were only three people who had seen the ugly crime committed who were alive when it was over. In the first three trials, one (Shannon) did not testify and a second (Melissa) denied culpability. The balance was changed in the fourth trial, and a conviction resulted. Shannon's testimony may not have made the difference, but I cannot say that to be so with the degree of conviction required by the "harmless error" rule applicable to a constitutional violation.

I believe we must reverse and remand for a new trial -- not because I believe Melissa Garrison is innocent, any more than a vote to affirm is a vote that as a juror I would have found her guilty. The role of an appellate court is to look at the overall trial and determine whether the jury was presented with proper evidence in order to reach its decision, and whether that decision was supported by sufficient evidence. My determination that we should reverse is based only on the first part of that two-step analysis.

When Shannon could not be cross-examined on the statements that incriminated Melissa, the right of an accused to confront the witnesses against her was denied. There was no hearsay exception that substituted for that denial. The error was not harmless beyond a reasonable doubt.

**McMILLIN, P.J., AND COLEMAN, J., JOIN THIS SEPARATE OPINION.**